**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MATTHEW LACHS, individually and on behalf of all others similarly situated, | Case No. 2:25-cv-06388 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| UNIVERSITY OF PENNSYLVANIA, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Matthew Lachs ("Plaintiff"), by his undersigned counsel, files this Class Action Complaint on behalf of himself and a class of all similarly situated persons against Defendant the University of Pennsylvania ("Defendant"). Plaintiff bases the forgoing allegations upon personal information and belief, the investigation of counsel, and states the following:

### INTRODUCTION

1.      The University of Pennsylvania, America's oldest university, was founded in 1740 by Benjamin Franklin, with the goal to "train young people for leadership in business, government, and public service."[1]

2.      Throughout the years, the University of Pennsylvania has continued that tradition, educating United States Presidents, Supreme Court Justices, Nobel Prize Winners, Pulitzer Prize Winners, athletes, actors, artists, and more.

3.      The University maintains a strong connection with its alumni, and through its alumni relations department it seeks to engage the University of Pennsylvania's nearly 300,000

---

[1] https://www.upenn.edu/about/history

living alumni "in a mutually beneficial, lifelong connection to each other, their school, and the University."[2] Regarding these alumni and other donors, the University collects additional information such as their net worths and donation histories.[3]

4.     In the regular course of business, the University of Pennsylvania accumulates from students, employees, and donors vast amounts of sensitive personal information including, among other things, names, addresses, telephone numbers, email addresses, and demographic details such as religion, race, and sexual orientation. From its donors specifically, the University accumulates information regarding the donors' donation histories and net worths.

5.     The University of Pennsylvania failed to adequately secure this trove of personal, sensitive information.

6.     Indeed, on October 30 and 31, 2025, hackers enjoyed "full access" to a university employee's account and exported data on "1.2 million University of Pennsylvania students, alumni, and donors" from university databases.[4] The full scope of the data exported is not yet known, but the hackers have made clear their plans to "extract plenty of value out of the data" and to eventually sell this information.[5]

7.     Plaintiff brings this class action complaint on behalf of a class of persons impacted by the University of Pennsylvania's failure to safeguard, monitor, maintain, and protect highly sensitive Personally Identifiable Information ("PII") and other Sensitive Information. The University of Pennsylvania collected, stored, and maintained Plaintiff's and the Class's Sensitive Information as part of its business activities.

---

[2] https://www.alumni.upenn.edu/s/1587/gid2/16/interior.aspx?sid=1587&gid=2&pgid=393
[3] https://www.thedp.com/article/2025/11/penn-hack-documents-released-gse-emails-data
[4] https://www.thedp.com/article/2025/11/penn-hack-documents-released-gse-emails-data
[5] https://www.bleepingcomputer.com/news/security/university-of-pennsylvania-hacker-claims-1.2-million-donor-data-breach/

8.     The type of information impacted by the Data Breach can be used to orchestrate a host of fraudulent activities, including financial fraud and identity theft. Indeed, a driving purpose of these types of data breaches is to obtain and misuse victims' Sensitive Information or to make it available on the dark web for misuse. Information such as the Sensitive Information accessed during the Data Breach may also be used to perform additionally targeted phishing or hacking attacks directed at the victims of the Data Breach. Consequently, all impacted individuals are at a heightened and substantial risk that their information will be disclosed to criminals and misused for attempted or actual fraud or identity theft.

9.     Hackers emailed Plaintiff, establishing their access and use of his Sensitive Information. Plaintiff remains at a continued risk of harm due to the exposure and potential misuse of his personal data by criminal hackers.

10.     As such, Plaintiff brings this Complaint on behalf of persons whose Sensitive Information was stolen during the Data Breach.

## JURISDICTION

11.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Here, there are 100 members or more in this proposed class, and at least one of those class members will be diverse from Defendant .

12.     This Court has general personal jurisdiction over the University of Pennsylvania because it is a Pennsylvania nonprofit corporation that maintains its principal place of business at 3450 Woodland Walk, Philadelphia, PA 19104

13.     This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and because Defendant conducts a substantial part of their business and is headquartered within this District.

## PARTIES

14.     Plaintiff Matthew Lachs is a citizen of Great Neck, NY and a former employee of and donor to the University of Pennsylvania. As a former employee and donor, the University of Pennsylvania obtained and maintained Plaintiff's Sensitive Information.

15.     Defendant University of Pennsylvania is a private university that maintains its principal place of business at 3450 Woodland Walk, Philadelphia, PA 19104.

## FACTUAL ALLEGATIONS

**A.      The University of Pennsylvania Failed to Safeguard the Sensitive Information it Collects from its Customers.**

16.     The University of Pennsylvania collects substantial information on its students, alumni, and donors, including their names, dates of birth, addresses, phone numbers, estimated net worths, donation histories, demographic details, and more.[6]

17.     Despite its collection of this sensitive information, the University of Pennsylvania failed to adequately safeguard it.

18.     On October 30 and 31, 2025, hackers gained access to a number of the University's systems including "Penn's VPN, Salesforce data, Qlik analytics platform, SAP business intelligence system, and SharePoint files."[7] Hackers did so by employing a technique known as

---

[6] https://www.bleepingcomputer.com/news/security/university-of-pennsylvania-hacker-claims-1.2-million-donor-data-breach/
[7] https://www.bleepingcomputer.com/news/security/university-of-pennsylvania-hacker-claims-1.2-million-donor-data-breach/

"social engineering," a well-known impersonation technique utilized by hackers to gain access to systems.

19.     The selection of the University of Pennsylvania as a target was not an accident. The hackers explained that they selected Penn as a target specifically because of the University's "fairly weak authentication system."[8] Specifically, contrary to best practices, the University exempted a number of high-ranking officials from its MFA policy.[9] These exemptions left the University particularly vulnerable to social engineering attacks.

20.     The University has since warned: "We encourage our entire community - inside and outside of Penn - to be wary of suspicious calls or emails that could be phishing attempts, particularly those that may be soliciting fraudulent donations, asking for your system credentials, or suggesting you change credentials or passwords."[10]

21.     The University has yet to reveal the full scope of information obtained.

**B.     The University of Pennsylvania Knew It Needed to Protect Users' Sensitive Data**

22.     As an entity in the business of handling Sensitive Information, The University of Pennsylvania knew, or should have known, that it needed to implement measures to adequately protect sensitive data.

23.     The University of Pennsylvania has received ample warning of the need to protect sensitive data.

24.     For example, the FTC has issued numerous guidelines for businesses highlighting the importance of reasonable data security practices. The FTC notes the need to factor data security

---

[8] https://www.thedp.com/article/2025/11/penn-hack-documents-released-gse-emails-data
[9] *Id.*
[10] https://university-communications.upenn.edu/data-incident

into all business decision-making.[11] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on networks to uncover unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[12]

25.    The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

26.    As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ▯ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ▯ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require

---

[11] Federal Trade Comm'n, *Start with Security A Guide For Business, Lessons Learned from FTC Cases* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[12] *Id.*; Federal Trade Comm'n, *Protecting Personal Information, A Guide For Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded The University of Pennsylvania's Data Breach, further clarify the measures businesses must take to meet their data security obligations.

27.     The University of Pennsylvania is aware of recent data breaches at universities and colleges across the country, including: Harvard,[13] Columbia,[14] the University of Minnesota,[15] Standford,[16] and more.

28.     Notwithstanding this awareness, the University of Pennsylvania failed to adequately secure its systems, leading to the exposure of the Sensitive Information of over 1.2 million individuals.

**C.     The University of Pennsylvania's Failed to Implement Reasonable Safeguards**

29.     The University of Pennsylvania could have minimized or altogether prevented the Data Breach by taking reasonable steps to properly secure and encrypt the Sensitive Information of Plaintiff and the Class and by maintaining a reasonable information retention policy to delete unnecessary Sensitive Information.

---

[13] https://www.darkreading.com/cyberattacks-data-breaches/harvard-breached-oracle-zero-day-attack
[14] https://www.securityweek.com/columbia-university-data-breach-impacts-860000/
[15] https://www.mprnews.org/story/2025/09/23/university-of-minnesota-begins-payouts-in-2023-data-breach-lawsuit
[16] https://edscoop.com/stanford-university-akira-cyberattack-ransomware-2024/

30.     Given the duration and the means by which it occurred, the Data Breach could only have happened with significant and highly concerning data security deficiencies that The University of Pennsylvania knew or should have known created a significant risk of harm to millions of individuals.

31.     In all, Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

- Failing to maintain an adequate data-security system to reduce the risk of data breaches and cyberattacks
- Failing to meet the standards established by its data-security and privacy policies
- Failing to adequately protect PII entrusted to it
- Failing to properly monitor its own data security systems for existing intrusions
- Failing to train its employees in the proper handling of emails containing PII and maintain adequate email security practices
- Failing to adhere to industry standards for cybersecurity.

32.     Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Sensitive Information by allowing cyberthieves to access Defendant's computer network and systems which contained unsecured and unencrypted Sensitive Information.

**D.     The University of Pennsylvania's Data Security Failures Have Harmed Plaintiff and the Class**

33.     Personal Information is valuable property. Its value is axiomatic, considering the market value and profitability of "Big Data" to corporations in America. Illustratively, Alphabet Inc., the parent company of Google, reported in its 2020 Annual Report a total annual revenue of $182.5 billion and net income of $40.2 billion. [17]  $160.7 billion of this revenue derived from its Google business, which is driven almost exclusively by leveraging the Personal Information it

---

[17] *Alphabet Inc., Annual Report (Form 10-K)*, SEC, at 32 (Feb. 3, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm.

collects about users of its various free products and services.

34.    Criminal law also recognizes the value of Personal Information and the serious nature of the theft of Personal Information by imposing prison sentences. This strong deterrence is necessary because cybercriminals extract substantial revenue through the theft and sale of Personal Information. Once a cybercriminal has unlawfully acquired Personal Information, the criminal can demand a ransom or blackmail payment for its destruction, use the Personal Information to commit fraud or identity theft, or sell the Personal Information to other cybercriminals on the black market.

35.    The U.S. Government Accountability Office ("GAO") released a report as far back as 2007 regarding data breaches, finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[18]   This has not changed over the nearly two decades since this study.

36.    The GAO Report explains that "[t]he term 'identity theft' is broad and encompasses many types of criminal activities, including fraud on existing accounts—such as unauthorized use of a stolen credit card number—or fraudulent creation of new accounts—such as using stolen data to open a credit card account in someone else's name."

37.    Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[19]   According to Experian, "[t]he

---

[18] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf [https://perma.cc/GCA5-WYA5].

[19] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things: "[n]ame, social security number, date of birth, official State or government issued driver's

research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to, among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; or use the victim's information in the event of arrest or court action.[20]

38.     With access to an individual's Sensitive Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including obtaining a driver's license or official identification card in the victim's name but with the thief's picture; using the victim's name and Social Security number to obtain government benefits; or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[21]

39.     Identity theft presents many challenges.  In a survey, the Identity Theft Resource Center ("ITRC") found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[22]

40.     The harm already suffered by Plaintiff demonstrates that the risk of harm to Plaintiff and Class members is present and ongoing.

---

license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id*.

[20] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Private Information and How Can You Protect Yourself*, Experian (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[21] *Id*.

[22] *ITRC Annual Data Breach Report 2023*, ITRC (2023), https://www.idtheftcenter.org/publication/2023-data-breach-report/.

41.    The risk of identity theft after a data breach is lasting. The U.S. Government Accountability Office's research into the effects of data breaches found that "in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web—as is the case in this Data Breach—fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot rule out the significant risk of future harm."[23]

E.    **Plaintiff's Experience**

42.    Plaintiff is a citizen of Great Neck, NY and a former employee of and donor to the University of Pennsylvania. In both of his capacities, the University of Pennsylvania obtained and maintained the Sensitive Information of Plaintiff and owed him a legal duty and obligation to protect and secure that Sensitive Information from unauthorized access or disclosure.

43.    On October 31, 2025, Plaintiff Lachs received emails from the hackers to his personal email. These emails purported to have been sent by the University of Pennsylvania. The hackers use of his personal email address indicates that the hackers possess Plaintiff Lach's highly sensitive information.

44.    Plaintiff Lachs suffered actual injury from having his Sensitive Information exposed as a result of the Data Breach, including: (a) time and effort monitoring his accounts for fraudulent charges and to mitigate the risk of harm from the Data Breach; (b) entrusting Sensitive Information to the University of Pennsylvania that he would not have had the University of Pennsylvania disclosed that it lacked data security practices adequate to safeguard its patients; (c) damages to and diminution in the value of his Sensitive Information—a form of intangible property

---

[23] Report to Congressional Requesters, Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown 29 (Jun. 2007), http://www.gao.gov/new.items/d07737.pdf (last accessed Nov. 30, 2018).

that he entrusted to the University of Pennsylvania as a condition of receiving healthcare services; (d) loss of his privacy; and (e) continuous imminent an impending injury arising from the increased risk of financial, medical, and identity fraud and theft.

45.    In addition, knowing that hackers accessed his Sensitive Information and that this likely has been and/or will be used in the future for financial, medical, and identity theft has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

46.    Despite the University of Pennsylvania's failure to reasonably protect Plaintiff's and the Class's Sensitive Information, it has not offered any compensation or adequate remedy, especially considering the significant and long-term risk Plaintiff and the Class face.

## CLASS ALLEGATIONS

47.    Plaintiff brings this action on behalf of himself and all other persons similarly situated pursuant to Fed. R. Civ. P. 23 and seeks certification of the following Nationwide Class:

> All individuals that received or were otherwise sent notice that their data was potentially compromised due to The University of Pennsylvania's Data Breach.

48.    Excluded from the class is The University of Pennsylvania and its subsidiaries and affiliates; all employees of The University of Pennsylvania; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

49.    Plaintiff reserves the right to, after conducting discovery, modify, expand or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

50.    **Numerosity**.  Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff believes that there are over one million members of the Class. The number of reportedly impacted

individuals already exceeds 10 million. The precise number of class members, however, is unknown to Plaintiff. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

51.     **Commonality and Predominance**.  Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members. These common questions include, without limitation:

a.     Whether The University of Pennsylvania knew or should have known that its data environment and cybersecurity measures created a risk of a data breach;

b.     Whether The University of Pennsylvania controlled and took responsibility for protecting Plaintiff's and the Class's data when solicited that data, collected it, and stored it on its servers;

c.     Whether The University of Pennsylvania's security measures were reasonable in light of the FTC data security recommendations, state laws and guidelines, industry standards, and common recommendations made by data security experts;

d.     Whether The University of Pennsylvania owed Plaintiff and the Class a duty to implement reasonable security measures;

e.     Whether The University of Pennsylvania's failure to adequately secure Plaintiff's and the Class's data constitutes a breach of its duty to institute reasonable security measures;

f.     Whether The University of Pennsylvania's failure to implement reasonable data security measures allowed the breach of its data systems to occur and caused the theft of Plaintiff's and the Class's data;

g.     Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

h.     Whether Plaintiff and the Class were injured and suffered damages or other losses because of The University of Pennsylvania's failure to reasonably protect its data systems; and

i.     Whether Plaintiff and the Class are entitled to relief.

52.    **Typicality**.  Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical member of the Class. Plaintiff and the Class are each persons whose data was provided to The University of Pennsylvania, whose data resided on The University of Pennsylvania's servers, and whose Sensitive Information was exposed in The University of Pennsylvania's Data Breach. Plaintiff's injuries are similar to other class members and Plaintiff seeks relief consistent with the relief due to the Class.

53.    **Adequacy**.  Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against The University of Pennsylvania to obtain relief for himself and for the Class. Plaintiff has no conflicts of interest with the Class.  Plaintiff has also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases.  Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

54.    **Superiority**.  Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. A class action would also permit customers to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

55.     **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), The University of Pennsylvania, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## LEGAL CLAIMS

### COUNT I
### Negligence

56.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

57.     The University of Pennsylvania owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the sensitive data it solicited from Plaintiff and the Class and managed and stored. This duty arises from multiple sources.

58.     The University of Pennsylvania owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target The University of Pennsylvania's data systems and servers containing Plaintiff's and the Class's sensitive data and that, should a breach occur, Plaintiff and the Class would be harmed. The University of Pennsylvania alone controlled its technology, infrastructure, and cybersecurity. It further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiff and the Class. Furthermore, The University of Pennsylvania knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of The University of Pennsylvania's unsecured, unreasonable data security measures.

59.     Additionally, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, required The University of Pennsylvania to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of The University of Pennsylvania's duty to Plaintiff and the Class.  Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like The University of Pennsylvania of failing to use reasonable measures to protect sensitive data.  The University of Pennsylvania, therefore, was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of The University of Pennsylvania's duty to adequately protect sensitive information. By failing to implement reasonable data security measures, The University of Pennsylvania acted in violation of § 5 of the FTCA.

60.     The University of Pennsylvania is obligated to perform its business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring the University of Pennsylvania to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class.

61.     Finally, The University of Pennsylvania assumed the duty to protect patients' sensitive data by soliciting, collecting, and storing individuals' data and, additionally, by representing to its customers that it would keep their customers' data safe.

62.     The University of Pennsylvania breached its duty to Plaintiff and the Class by implementing unreasonable data security measures that it knew or should have known could cause a Data Breach. The University of Pennsylvania knew or should have known that hackers might

target sensitive data that the University of Pennsylvania solicited and collected on its users and, therefore, needed to use reasonable data security measures to protect against a Data Breach.

63.    The University of Pennsylvania was fully capable of preventing the Data Breach. The University of Pennsylvania knew or should have known of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited and shortened the scope of the Data Breach. The University of Pennsylvania thus failed to take reasonable measures to secure its system, leaving it vulnerable to a breach.

64.    As a direct and proximate result of The University of Pennsylvania's negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

**COUNT II**
**Negligence *Per Se***

65.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

66.    The University of Pennsylvania's unreasonable data security measures and failure to timely notify Plaintiff and the Class of the Data Breach violates Section 5 of the FTC Act. Although the FTC Act does not create a private right of action, requires businesses to institute reasonable data security measures and breach notification procedures, which The University of Pennsylvania failed to do.

67.    Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like The University of Pennsylvania of failing to use reasonable measures to protect

users' sensitive data.  The FTC publications and orders described above also form the basis of The University of Pennsylvania's duty.

68.    The University of Pennsylvania violated Section 5 of the FTC Act by failing to use reasonable measures to protect individuals' personally identifying information and sensitive data and by not complying with applicable industry standards.  The University of Pennsylvania's conduct was particularly unreasonable given the sensitive nature and amount of data it stored on individuals and the foreseeable consequences of a Data Breach should The University of Pennsylvania fail to secure its systems.

69.    The University of Pennsylvania violation of Section 5 of the FTC Act constitutes negligence *per se*.

70.    Plaintiff and the Class are within the class of persons Section 5 of the FTCA (and similar state statutes) was intended to protect.  Additionally, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same type of harm suffered by Plaintiff and the Class.

71.    As a direct and proximate result of The University of Pennsylvania's negligence per se, Plaintiff and the Class have suffered and continue to suffer injury.

**COUNT III**
**Declaratory and Injunctive Relief**

72.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

73.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as those

alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

74.    An actual controversy has arisen in the wake of the Data Breach at issue regarding The University of Pennsylvania's common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class.  Plaintiff alleges The University of Pennsylvania's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable.  Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

75.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

        a.    The University of Pennsylvania owed, and continues to owe a legal duty to secure the sensitive information with which it is entrusted, and to notify impacted individuals of the Data Breach under the common law, Section 5 of the FTC Act;

        b.    The University of Pennsylvania breached, and continues to breach, its legal duty by failing to employ reasonable measures to secure its customers' personal information; and

        c.    The University of Pennsylvania's breach of its legal duty continues to cause harm to Plaintiff and the Class.

76.    The Court should also issue corresponding injunctive relief requiring The University of Pennsylvania to employ adequate security protocols consistent with industry standards to protect its individuals' (*i.e.* Plaintiff's and the Class's) data.

77.     If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of the University of Pennsylvania's data systems. If another breach of The University of Pennsylvania's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

78.     The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to The University of Pennsylvania if an injunction is issued.

79.     Issuance of the requested injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

### PRAYER FOR RELIEF

80.     Wherefore, Plaintiff, on behalf of himself and the Class, requests that this Court award relief as follows:

a.      An order certifying the class and designating Plaintiff as the Class Representative and their counsel as Class Counsel;

b.      An award to Plaintiff and the proposed Class members of damages with pre-judgment and post-judgment interest;

c.      A declaratory judgment in favor of Plaintiff and the Class;

d.      Injunctive relief to Plaintiff and the Class;

    e.        An award of attorneys' fees and costs as allowed by law; and

    f.        An award such other and further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

81.      Plaintiff hereby demands a jury trial for all the claims so triable.

Respectfully submitted,

Dated: November 12, 2025

*/s/ Gary F. Lynch*
Gary F. Lynch (PA 56887)
Patrick Donathen (PA 330416)
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
gary@lcllp.com
patrick@lcllp.com

Brian C. Gudmundson
(*pro hac vice*  forthcoming)
Michael J. Laird
(*pro hac vice* forthcoming)
Madison M. DeMaris
(*pro hac vice* forthcoming*)*
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com
michael.laird@zimmreed.com
madison.demaris@zimmreed.com

*Counsel for Plaintiff*